IN THE

# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF INDIANA,

AT INDIANAPOLIS, MAY TERM, 1869, IN THE FIFTY-THIRD YEAR
OF THE STATE.

———————◇———————

## HEATH *v.* WILLIAMS.

MORTGAGE.—CONDITIONAL SALE.— *Construction of.—Evidence.*—It is settled in
this State, that parol evidence is admissible to aid in distinguishing between a
conditional sale and a mortgage.

SAME.—In a case of doubt, equity will construe a writing as a mortgage
rather than a conditional sale.

SAME.—On the 25th of March, 1858, J. H. and B. W. executed the following
instruments, the land therein mentioned having been conveyed by B. W.
to D. H. on the 24th of February, 1858, by a deed absolute on its face:
"This is to certify that I am to make, or cause to be made, a deed for 360
acres of land in Benton county, Indiana, the land B. W. sold to me for D.
H., on the payment of all money to said D. H. that he pays on said land;
that is, if the money is paid on or before the 23d of February, 1859.
(Signed) J. H." "This is to certify that I, B. W., sold to J. H. for D. H.,
on the 23d day of February, 1858, 360 acres of land in Benton county,
Indiana, for $5,400; and I agree to receive all receipts, where money is
paid for claims against the land, as payments on the above land mentioned;
and I agree to take a note B. B. & Co. hold against me in payment on said
land; and I give full possession from day of sale. (Signed) B. W. Re-
ceived on the above land $1,007.67. (Signed) B W."

*Held,* upon these writings and parol evidence showing that the conveyance
was intended to be a security for the payment of money, that the transac-
tion was a mortgage.

APPEAL from the Tippecanoe Circuit Court.

RAY, J.—This was an action by David Heath against

Barton Williams, to quiet the title to certain lands. The complaint alleges, in substance, that on the 24th of February, 1858, Williams sold and conveyed to him by warranty deed in fee, three hundred and sixty acres of land; that he went into immediate possession of it, and made lasting improvements thereon, &c.; but that Williams claimed the conveyance to be only a mortgage, and threatened suit for redemption, &c. Prayer, that the plaintiff's title should be quieted, and for general relief. This suit was brought in Benton county, where the land lies, and on plaintiff's application the venue was changed to Tippecanoe county.

Williams files an answer and cross-complaint, alleging, substantially, that the conveyance to plaintiff was intended by the parties to be wholly in the nature of a mortgage, and not an absolute deed; that at its date he was indebted to Joseph Heath, the plaintiff's son, by a note made in 1856, for seven hundred dollars, and to divers other persons in different sums, making an aggregate of debts of four thousand nine hundred and thirty-two dollars; that it was agreed between him and Joseph Heath, who was acting for himself and as plaintiff's agent, that a deed, absolute on its face, but really a mortgage, should be made of the lands to David Heath, to secure Joseph's debt and such other debts as they should pay for Williams, and that a written agreement should be given by Joseph, as such agent, securing the right of redemption upon the payment of his debt and such other sums as might be paid by either of the Heaths on Williams' account, with twenty-five per centum per annum interest thereon. Williams further alleges, that when the deed was made it was agreed that he should have until the 23d of February, 1859, in which to redeem the land, which agreement was reduced to writing, but which writing had been lost; that Joseph Heath was embarrassed with debts, and could not hold lands, and so they were conveyed to the plaintiff, his father, who took and held them in trust for Joseph, the latter having moved upon and occupied them for several years; that their rents had been enjoyed by the

plaintiff and his son, and were of the value of five thousand dollars; that waste had been committed by them on the lands to the amount of two thousand dollars; that he, Williams, had labored for them on the farm, on account of said debts, to the amount of one thousand dollars; and the parties had embarked in a cattle adventure, the profits of which were five thousand dollars, and by agreement one-fifth was to belong to Williams and be applied to the said debts. Prayer for an account and redemption of the land. The cross-complaint was verified by affidavit, and Joseph Heath was made a party defendant and voluntarily appeared. A demurrer to this answer and cross-complaint was overruled, but as no point is made upon the questions raised by this ruling in the appellant's brief, we treat it as waived.

The appellant answered the counter-claim in three paragraphs:

1. A general denial.

2. "He says he purchased said lands described in the counter-claim and received a deed for the same; that said sale was a conditional one, the conditions being fully set out in a written memorandum as mentioned in said counter-claim, but said Williams never complied or offered to comply with said conditions; but the plaintiff says the substance of said written memorandum is not correctly stated in said counter-claim, and when it is produced it will show that said sale was a conditional one, and not a mortgage transaction; and that said sale has become absolute by the failure of said Williams to comply with the conditions to be performed by him."

3. That when the lands were conveyed to plaintiff it was supposed they were worth more than the agreed price, and it was agreed that if Williams could sell the lands within a year at an advance, he should be at liberty to do so;. and a conveyance should be made to the new purchaser; that shortly afterward a written memorandum was made of this

conditional arrangement, by which it will be seen that said sale was a conditional one, but the conditions were never complied with by Williams; that plaintiff took possession of the land, made improvements thereon, &c., but that no profits from its use were ever realized. An itemized account of debts paid, improvements made, &c., is set out, and this paragraph is framed with a view to an account, in the event of the transaction being found to be a mortgage. Joseph Heath adopted his father's answer.

To the second and third paragraphs of these answers replies were filed by Williams, denying the same, except so far as they admitted the allegations of the answer and cross-complaint. The issues thus made, it will be seen, are as follows:

1. Plaintiff asserted that he had a fee simple absolute title in the lands. The defendant, Williams, denied it, and said he only had a mortgage upon them.

2. Plaintiff asserted that the sale and conveyance to him, plaintiff, were conditional, and that if the money advanced by him upon the lands was not refunded by Williams by a resale of them or otherwise within a year, then the sale was to be absolute, and he having failed to refund in that time, had lost all right. Williams denied this, and insisted upon his answer and cross-complaint, which sets up that the transaction was only a mortgage.

3. Issue upon accounts as to amount necessary to redeem.

These issues were tried by a jury, who found that the transaction was a mortgage, and on the payment to the plaintiff by Williams of three thousand three hundred and seventy-five dollars he would be entitled to a reconveyance of the land.

Motions for a new trial and for judgment for plaintiff *non obstante veredicto* were overruled, and final decree for Williams, that on payment of the sum found due by the jury the land should be reconveyed to him, and in default of such payment the land should be sold without relief, &c., to pay the same, and taxing costs against the plaintiff.

On the trial, it was admitted that the only title of the plaintiff or of Joseph Heath was derived under the defendant Williams by a deed absolute on its face, and a copy of which is made a part of the cross-complaint by said defendant. It was also admitted that the acts and admissions of Joseph Heath should be proved, and have the same force and effect as though they were the acts and declarations of the plaintiff.

Barton Williams, the defendant, testified that on the 24th of February, 1858, he owed Joseph Heath a note for seven hundred dollars, for money advanced to him some time before, to purchase cattle; the note, with the interest, amounted to seven hundred and forty-four dollars. He was also indebted as follows:

To E. C. Sumner ........................... $  700.00
" Philip Williams, by judgment, ............ 275.00
" Barbee, Brown & Co., upwards of ......... 600.00
" Jane Williams, his mother, for dower in farm, 400.00
" Jacob Harman, due June, 1858, .......... 1,800.00
" Isaac Lewis, about ............. $70.00 or 75.00
" Lewis & Ladd, on account, ............... 120.00

About the 22d of February, 1858, he returned home from New York, and found Joseph Heath at his house. Heath said he had come for his money. Williams told him he would have it soon. Heath replied that he *wanted it*. Williams stated that he was in a tight place. Heath then told him that he had a little money, and if Williams would make him safe he would help him. Williams agreed that if he would advance him enough to make his indebtedness to him, with the note, one thousand dollars, he would pay twenty-five per cent. interest. Two instruments in writing were handed to the witness, which are as follows:—

"March 25th, 1858. This is to certify that I am to make, or cause to be made, a deed for three hundred and sixty acres of land in Benton county, Indiana, the land that Barton Williams sold to me for David Heath, on the payment of all money to said David Heath that he pays on said land;

that is, if the money is paid on or before the 23d day of February, 1859.                                JOSEPH HEATH."

"This is to certify that I, Barton Williams, sold to Joseph Heath, for David Heath, on the 23d day of February, 1858, 360 acres of land in Benton county, Indiana, for five thousand four hundred dollars. And I agree to receive all receipts, where money is paid for claims against the land, as payments on the above land mentioned. And I agree to take a note Barbee, Brown & Co. hold against me in payment on said lands. And I give full possession from day of sale.                                BARTON WILLIAMS.

"Received on the above land $1,007.67.
                                "BARTON WILLIAMS."

The witness admitted these instruments as originals, and continued: At the time the deed was made (which was a deed in fee simple), some twenty-five or thirty dollars were paid, and the balance was to go on the debt to Heath, and judgments, &c., in Oxford. Joseph Heath moved on the farm in April, 1858, and Williams went to work for him on the 15th of June following, and continued there at work until April 8th, 1860. Joseph Heath stated that there was a judgment against him, and the deed would have to be made to his father, who lived in Ohio, and who frequently came to the farm. The farm was a stock farm and in good condition, with one hundred and forty-five acres in cultivation for plowing, and one hundred and eighty acres in blue grass pasture, well set, and with good water running through it. It was worth twenty-five dollars per acre. At the time the deed was made there were one hundred and thirty acres of good rail timber on the farm. Williams' labor was to be applied on improvements or indebtedness, and was worth one dollar per day. Heath had from one hundred to two hundred head of cattle on the farm all winter. Heath hauled away about one thousand four hundred rails. He also took two hundred and twenty panels of rails belonging to Williams, which were on the other land, also three

hundred and forty panels between the John Williams farm and the defendant's—in all fourteen thousand seven hundred and forty. There were also rails cut from timber on the land, worth seven dollars per hundred, in amount some six thousand four hundred and twenty-three dollars, and half a mile of fence, four thousand two hundred and fourteen rails, part of which went to build a fence on other lands, and worth eight to nine dollars per hundred. Williams had made arrangements to get the money to pay Heath from E. C. Sumner, and in January, 1859, he told Heath he wanted to settle with him, as the time was about out. Heath answered, "Never mind, we can fix that some other time." Heath was going to Illinois, and said he had not time to settle, but would make it all right, and they would wait till fall, and he would sell his cattle, and fix it up. In the fall, when the water gave out at Parish's Grove, Williams went and herded the cattle day and night about a month. When the cattle were about all gone, Williams again applied for a settlement, but Heath told him not to be uneasy, and he would pay him double wages for what he did for him. In the spring of 1860, Joseph Heath proposed that Williams should go with him and his father to Illinois and buy cattle and herd them, and Williams should have the profit on fifty head. They went to Illinois and purchased three hundred and forty-three cattle, and brought them home in June, and Williams herded them till the middle of September. Old man Heath seemed, from his conversation, to understand the arrangement in regard to the cattle, and told Williams, the better care he took, the more money they would make. The lot of three hundred cattle made a profit of four thousand dollars. The share of Williams was to go on the indebtedness. Heath never denied Williams' right to redeem the farm until the summer of 1860, when Williams was herding cattle, when he talked about keeping the farm, and Williams told him he would have it out with the old man about that. When the deed was made Williams proposed a mortgage, but Heath said he would rather have a

deed, and then if he had to pay any more money than the one thousand dollars, it would make him secure. Williams replied that he had borrowed money by a trust deed, as he understood it was called, and he could do it again. Heath was to make a deed back in 1859. Williams took up his note for seven hundred and forty-four dollars, and the balance of the one thousand dollars was paid on judgments, and the Barbee, Brown & Co. note was paid in 1860. It was never surrendered to Williams. The Harman debt was a note and mortgage on the land, five hundred dollars of which was paid in 1860, some more five or six months after, and the balance in 1861. When the first five hundred dollars was paid, Williams was present and told Heath not to pay it, as he would have no more to do with it, for he (Williams) would pay it himself. Heath drew the writings of March 25th, 1858.

The cross-examination contains the following:—

Question. "How much was paid when the deed was made?"

Answer. "$1,007.00."

Q. "Was your agreement at that time put in writing?"

A. "No, not till afterwards."

Q. "Is the signature of Barton Williams to the papers dated March 25th, 1858, now handed you again, genuine?"

A. "Yes."

Q. "Did you understand the agreement, as finally agreed upon at the time the deed was made, to be that set out in these two writings?"

A. "Yes."

Q. "How much did you talk about your trade before the deed was made?"

A. "We talked about it a good deal, off and on, from the time Heath came till the deed was made."

Q. "Did these writings fully and fairly express precisely what you intended they should?"

A. "Yes."

Heath *v.* Williams.

Q. "How did it come these writings were executed?"

A. "I wanted to show what my rights were."

Q. "Did you ask to have your bargain put in writing?"

A. "Yes."

Q. "Was the object in putting it in writing to have it in black and white, so there should be no mistake about it?"

A. "Yes."

Q. "Were you satisfied when these writings were drawn and signed that they contained your agreement, as made?"

A. "Yes."

Q. "At the time the deed was made, did not Heath pay your mother two hundred dollars in money for you, and give his note for two hundred dollars more, to pay what you owed her?"

A. "Yes."

In answer to further questions, Williams stated that "the money paid on judgments for me by Heath was paid to Templeton, the sheriff, and that was included in my receipt for one thousand and seven dollars. At the time of making the deed Heath paid some expenses, three or four dollars, and gave me fifteen or twenty dollars. I don't know whether he then paid Littler twenty dollars for me. In February, 1859, there was nothing paid by Heath but the one thousand and seven dollars. Sumner was to let me have four thousand dollars at twenty-five per cent. interest, and I. was to take enough of this to pay Heath, and put the balance in cattle, to be kept on shares with Sumner. The land, when the deed was made, was not rated at anything. We counted up what I owed. It was arranged that Heath was to let me have enough money, with my note, to make one thousand dollars; that was all he was expected to pay. The reason a mortgage was not made was, that if he paid other debts he would be secure. The eighty acres where the house was were not under mortgage. It was this one thousand and seven dollars I proposed settling in January, 1859. I expected to pay what was due him. I could have got the money, as I said, from Sumner. I told Heath not to pay

Harman anything till the spring of 1859. He then paid on it five hundred dollars to Rudolph Gates. I was present, and am certain of this. The land in the bond of Sumner is covered by my deed; and is part of the three hundred and sixty acres. We counted up what I owed; five thousand four hundred dollars was the amount of my debts. We talked a good deal. Heath said the land was not worth more than fifteen dollars per acre. I said it was worth more. The south-west eighty acres of mine was worth forty dollars per acre, and twenty-five dollars per acre without the timber. There was on my land a frame house, thirty-two by sixteen feet, and a good barn. Some of the land had been in cultivation twelve years; some of one forty, thirty-five years, an orchard; the underbrush had been cut out of much of the timber. I assigned to Heath the bond of Sumner."

A list of payments by Heath was shown to Williams, which he admitted, as to amounts, as paid or assumed by Heath under the agreement. On re-examination, he stated that he supposed he must have been in error in saying one thousand and seven dollars was all that was paid till after the year had expired.

Philip Griffin testified, that in December, 1857, he offered for this farm thirty-two dollars per acre, cash, and it was worth it.

Joseph Heath was introduced on his own behalf, and for his father, and denied any agreement to credit the amount due for labor by Williams or the profit on the cattle upon the debt secured by the land. He also denied that Williams offered to redeem in January, 1859, or within the year. *He was not examined as to whether the transaction was intended as a mortgage or sale.* He owned other adjoining lands, and stated, " from these tracts and the Barton Williams tract I have made rails and fences backwards and forwards as I thought best, but never sold a rail, *or took one away from these several tracts.*

Witnesses testified as to the value of the land at the time

of the conveyance. Williams' witnesses fixed the value as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Barton Williams, per acre, | | | - | - | | - | $25.00 |
| Robert Atkinson, | " | " | - | - | - | 18.00 to | 24.00 |
| H. Parker, | " | " | - | - | - | - | 25.00 |
| T. Stembel, | " | " | | - | - | 15.00 to | 25.00 |
| P. Griffin, | " | " | - | - | - | - | 32.00 |
| T. Smiley, | " | " | - | - | - | 22.00 to | 25.00 |
| N. Melville, | " | " | - | - | - | 22.00 to | 25.00 |

Heath's witnesses testified as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| David Heath, per acre, | | - | - | - | | $12.00 to | 15.00 |
| S. Ellsworth, | " | " | - | - | - | 10.00 to | 15.00 |
| T. Bell, | " | " | - | - | - . | 18.00 to | 20.00 |
| W. Bell, | " | " | - | - | - | - | 15.00 |
| G. Shuster, | " | " | - | - | - | - | 15.00 |
| Joseph Heath, " | " | · | - | - | - | - | 15.00 |

Evidence was also introduced to show the rental value of the property.

The appellant asked the court to instruct the jury as follows:—

"1. To construe a written contract is the duty of the court, and the court is alone responsible for the correctness of such construction.

"2. If the jury find from the evidence that an absolute deed was made of the lands in controversy, by Williams to David Heath, and the cotemporaneous oral agreement was fully, fairly, and accurately embraced in the two written instruments dated 25th March, 1858, one signed by Williams, the other by Joseph Heath, these said instruments should alone be regarded as containing the agreement of the parties, and the agreement should be enforced, unless contrary to law.

"3. The said deed and two writings, taken together and without any other proofs, would show the transaction to be a conditional sale, and not a mortgage.

"4. Under these instruments, without further proofs,

there would be no debt of any kind created by these instruments in favor of Heath against Williams.

"5.   And it is a necessary ingredient in a mortgage that the mortgagee should have a remedy against the person of the debtor.   If the remedy really exists, its not being reserved in terms will not affect the case.   But it must exist, in order to justify a construction which overrules the express words of the instrument.

"6.   Under these written instruments, if the lands had been found to be only half as great in value as the sum agreed to be paid by Heath, he could only have got the lands, and could not have asserted any claim against Williams.

"7.   If Williams, at the end of the time fixed by the instruments, had complied with his agreement and made the payments stipulated for, then Heath would have been entitled only to the payments made by him, without interest, and would not have been liable to any rents.

"8.   Gross inadequacy of price does not exist when the price is within the limits of any range of prices fixed by competent, credible, and trusty witnesses; there often being wide differences of opinion among men as to values.   But to constitute gross inadequacy, it must be so great as to shock the senses of fair men, and show that some fraud or oppression has been practiced.   There would be gross inadequacy if the price should bear but a small proportion to the real value.

"9.   To warrant a court in holding a transaction that is on its face a conditional sale, a mortgage, on account of inadequacy of price, that inadequacy must be so great as to be gross inadequacy as already defined.

"10.   When the question is, whether a transaction is a conditional sale or a mortgage, if it is shown that the grantee was put into possession at the time of the execution of the deed, and with the knowledge, and without objection from the grantor, has exercised the ordinary rights of an owner, making lasting and valuable improvements, making

expensive changes in the property, such facts are strong evidence that the transaction was a conditional sale, and not a mortgage.

"11. If, under the facts found, Williams had the right to demand and recover, after the expiration of the year, from Heath, any unpaid balance of the fifty-four hundred named as the price of the land, then this was a conditional sale, and not a mortgage."

These instructions were refused, and the court gave the following:—

"1. The instruments of writing given in evidence, of themselves and in the absence of other testimony, do not constitute the deed in the pleadings mentioned, a mortgage. If, however, the jury shall believe from the evidence that the defendant, Williams, made the deed to the plaintiff mentioned in the pleadings, to secure a debt which the defendant owed Joseph Heath and other sums of money which the plaintiff should pay for him of debts pressing upon him, with an oral agreement that the lands should be conveyed to him upon the defendant's payment of the sum thus owing to Heath and other sums paid by him, and the lands conveyed to Heath were of materially greater value than Williams was to receive for them, and the parties afterward met and executed the written agreements of March 25th, 1858; the transactions taken together operate as a mortgage.

"2. If you determine the conveyance of the land to be a mortgage security, then you are to proceed to take an account of what, if anything, is due the plaintiff. The plaintiff is entitled to have allowed him the moneys paid to Williams, or to other persons upon his request, the judgments and mortgages upon the lands, with interest, the taxes and the value of necessary improvements and repairs, and such other items as he has shown to be due him from Williams. Williams is entitled to credit for all such sums as he has paid in labor, rents of lands, damages for waste, profits on

cattle, or other items paid to the plaintiff or received by the plaintiff on his (Williams') account.

"3.   When a deed, absolute on its face, has been executed, if a debt existed between the parties and is embraced as the whole or part of the consideration, then, if the debt still subsists and the relation of debtor and creditor remains, it is a mortgage.   But if the debt is extinguished by the agreement of the parties, or the money advanced is not by way of loan, and the grantor has the privilege of refunding it if he pleases by a given time, and thereby entitle himself to a conveyance, it is a conditional sale.

"4.   If the jury, under the instructions of the court, find this a conditional sale, then Williams must show that he has complied with the condition within the time limited, or he will have no rights under the ageement.

"5.   If the jury find, from the evidence, this to be a conditional sale, and that the condition has not been complied with, and the time for compliance has expired, they will find for the plaintiff and say, 'we, the jury, find for the plaintiff, and that his title to the lands in controversy is absolute, and should be quieted against any claims of the defendant, Barton Williams.'"

There are many authorities cited by counsel, in which the question of the construction to be placed upon contracts of this nature is fully discussed.   But as the rule that parol evidence is admissible to aid in such construction must be regarded as settled in this State, we shall not consider that question as requiring any special argument, for the contract must be governed by the law as it exists here; "for whether a given transaction is a mortgage or not, and whether it is or is not valid, is a matter of *lex rei sitæ*."   2 Washb. Real Prop. 44, 7 (3d ed.).

In the case of *Davis* v. *Stonestreet*, 4 Ind. 101, it is said, "There are numerous criteria recognized by the courts to distinguish between a conditional sale and a mortgage; the price, the circumstances, the situation of the parties, &c.   But these and other considerations, which have con-

trolled the decisions of courts of equity, are so blended in the reported cases, setting aside, at times, the express agreements of the parties, that it is difficult to deduce a rule at once safe and comprehensive. The element which is regarded as conclusive in one case, is wholly wanting in another; and each case seems to be decided very much on its own peculiar circumstances."

This question was discussed in the Supreme Court of the United States in the case of *Russell* v. *Southard*, 12 How. 139. In that case Russell conveyed by an absolute deed in fee simple to Southard two hundred and sixteen acres of land. At the time the deed was delivered, Southard gave to Russell a memorandum. It recites, in substance, that Russell has this day sold and absolutely conveyed to Southard said Russell's farm, and the possession thereof actually delivered, for a sum of money stated; that said Southard agrees to resell and convey to Russell said farm, for the same sum of money before stated, to be paid within four months from date; that if the money be not paid punctually, the agreement should be null and void. The instrument then goes on thus: "This agreement of resale by the said Southard to the said Russell, is conditional and without a valuable consideration, and entirely dependent on the payment, on or before the expiration of four months from and after the date hereof, of the said sum of $429.81½ and interest thereon from this date, as aforesaid. And this agreement is to be valid and obligatory only upon the said Southard, upon the punctual payment thereof of the sum and interest as aforesaid, by the said Russell." This agreement was signed by both parties in duplicate. The court, after alluding to the character of the deed, and quoting in full said agreement, proceed: "The first question is whether this transaction was a mortgage, or a sale. It is insisted, on behalf of the defendants, that this question is to be determined by inspection of the written papers alone, oral evidence not being admissible to contradict, vary, or add to their contents. But we have no doubt extraneous evidence

is admissible to inform the court of every material fact known to the parties when the deed and memorandum were executed. This is clear, both upon principle and authority. To insist on what was really a mortgage, as a sale, is in equity a fraud, which cannot be successfully practiced, under the shelter of any written papers, however precise and complete they may appear to be." Here follow numerous authorities. "It is suggested," say the court, "that a different rule is held by the highest court of equity in Kentucky. *** But we do not perceive that the rule held in Kentucky differs from that above laid down. That rule, as stated in *Thomas* v. *McCormack*, 9 Dana, 109, is that oral evidence is not admissible in opposition to the legal import of the deed and the positive denial in the answer, unless a foundation for such evidence had been first laid by an allegation, and some proof of fraud or mistake in the execution of the conveyance, or some vice in the consideration. But the inquiry still remains, what amounts to an allegation of fraud, or of some vice in the consideration—and it is the doctrine of this court, that when it is alleged and proved that a loan on security was really intended, and the defendant sets up the loan as a payment of purchase money, and the conveyance as a sale, both fraud and a vice in the consideration are sufficiently averred and proved to require a court of equity to hold the transaction to be a mortgage."

Chancellor KENT has expressed the view taken by a court of equity, as distinguished from the arbitrary rules controlling a court of law, thus: "In ascending to the view of a mortgage in the contemplation of a court of equity, we leave all these technical scruples and difficulties behind us. Not only the original severity of the common law, treating the mortgagor's interest as resting upon the exact performance of a condition, and holding the forfeiture or the breach of a condition to be absolute, by non-payment or tender at the day, is entirely relaxed; but the narrow and precarious character of the mortgagor at law is changed, under the more enlarged and liberal jurisdiction of the courts of equity. Their influ-

ence has reached the courts of law, and the case of mortgages is one of the most splendid instances in the history of our jurisprudence, of the triumph of equitable principles over technical rules, and of the homage which those principles have received by their adoption in the courts of law." 4 Kent Com. 158.

In the note to *Thornbrough* v. *Baker*, Mr. Hare, after a very full citation of the decisions on the subject, draws this conclusion: "The course of decision which allows the legal effects of a deed, whether absolute or conditional, to be varied by parol evidence of the circumstances under which it was given, or the end which it was designed to fulfill, is not inconsistent either with the Statute of Frauds or the more general rules of evidence of the common law. If it were so, the equity of redemption of the mortgagor, and the whole system of equity as to mortgages, could have no existence; for nothing can be a greater departure from the terms of an instrument, than to convert a deed conditioned to be void on the performance of an act by the grantor on a day certain, which like all conditions in avoidance is legally inoperative unless fulfilled to the letter, into a vested equitable estate, exposed to a legal forfeiture against which equity will relieve. Yet such is the long and well established course adopted in chancery, in every instance in which it has occasion to pass judgment upon the respective rights of a mortgagor and mortgagee. It is obvious, therefore, that the equity of the mortgagor is paramount to the deed, and that facts and circumstances establishing its existence, may be given in evidence, not for the purpose of contradicting the deed, but for that of controlling its operation." 3 White & T. Lead. Cas. 628 (3d Am. ed.).

Washburn defines a mortgage, as "any conveyance of lands intended by the parties, at the time of making it, to be a security for the payment of money or the doing of some prescribed act." 2 Washb. Real Prop. 43, 7 (3d ed.).

That this was so intended, we have the positive evidence of Williams, uncontradicted by Heath, and the evidence

that Heath himself offered to make the loan upon being secured.

And here we may as well remark that we attach no importance to the statement by Williams on his cross-examination, that he understood "the agreement, as finally agreed upon at the time the deed was made, to be that set out in the writings;" and that "these writings fully and fairly express precisely what he intended they should." His attention was called to these writings before he made his statement of the contract; and the shrewdness of counsel cannot conceal the fact that the witness on cross-examination was simply testifying to the legal construction placed by him upon the instruments. The effect of his evidence was simply that he intended to execute what, in legal effect, would amount to a mortgage; that he understood the writings as expressing such an intention and amounting to such an instrument, and so regarding them, they did express his understanding, and he was satisfied with them. The witness was made to swear to the legal effect of the writings, and of course such evidence is of no value and cannot qualify in any way his statement of the circumstances, conversations, and intentions of the parties to the contract; and force is added to this evidence, when the plaintiff is placed upon the stand, and no denial that the instrument was intended to secure the loan of money is attempted by him. To this may be also added the fact, that a witness owning some seven hundred acres of land near this farm, offered the defendant Williams, a month or two preceeding this transaction, thirty-two dollars per acre in cash for the farm. This certainly shows no intention on the part of Williams to sell, and the fact that he had negotiated a loan to pay off Heath's debt, placed him beyond the present necessity of selling.

The instruments upon their face are not complete, either as a mortgage or conditional sale. As a conditional sale, there is no time fixed for payment of the purchase money, and it left it at the pleasure of the plaintiff to pay claims against the land, or to leave Williams to answer them. On

the other hand, there is no agreement in the writings binding Williams to repay the money, which, if it were there, would be conclusive evidence of a mortgage. The proof of a loan, however, supplies this defect, and would give Heath a lien upon the land to secure the debt. Equity, in a case of doubt, will construe a writing as a mortgage rather than a conditional sale. *Davis* v. *Stonestreet*, 4 Ind. 101, and authorities there cited. In that case it is stated, that courts of equity are disposed to consider every deed, whatever be its form, which resolves itself into a security for the performance of any act, as a mortgage.

In *Harbison* v. *Lemon*, 3 Blackf. 51, A. conveyed a tract of land to B. in consideration of a certain sum of money, and B., on the same day, obligated himself by a bond to reconvey the land to the grantor on the repayment of the purchase money within a certain time. Held, that these two instruments of writing, taken together, amounted to a mortgage. See, also, *Holcroft* v. *Hunter*, 3 Blackf. 147; *Watkins* v. *Gregory*, 6 Blackf. 113; *Crassen* v. *Swoveland*, 22 Ind. 427.

These cases, indeed, go far to deny the construction given the instruments upon their face by the court in this case, and rather tend to declare the transaction a mortgage, *prima facie*, without parol proof. But this point we do not decide.

The writings, with the evidence of the circumstances under which they were given, relieve the case of all doubt, and fully sustain the findings of the jury. So far as the appellant's rights were involved, the instructions of the court were unobjectionable.

The judgment is affirmed, with costs.

GREGORY, J., having been of counsel, was absent.

*S. A. Huff* and *R. Jones*, for appellant.

*H. W. Chase, J. A. Wilstach, J. L. Miller*, and *D. P. Vinton*, for appellee.